Oral argument not to exceed 15 minutes per side, Ms. Davidson for the Plaintiff Appellant. Good afternoon. Good afternoon. Good afternoon. May it please the court, my name is Saida Davidson. I represent Karen Kenney, who is the Plaintiff Appellant in this matter. I have already indicated to your clerk that I would like to reserve two minutes for rebuttal at this time. Thank you. This appeal focuses on whether three specific items should have been considered evidence of heightened scrutiny or legitimate business reasons. Had the district court viewed the evidence in the light most favorable to plaintiff as it must do at the summary judgment stage, these items would have been viewed as evidence of heightened scrutiny, at least sufficient to raise a genuine issue of material fact, thereby precluding summary judgment. The district court found that for purposes of Ms. Kenney's Title VII retaliation claim, she had established that she engaged in protected activity and that her employer knew about it. They also concluded that she suffered an adverse employment action. The district court also agreed with our position of law that for purposes of making a prima facie case of Title VII retaliation, temporal proximity coupled with heightened scrutiny is sufficient to show that there was a causal connection between a plaintiff's protected activity and her termination. However, the district court committed error in finding that there was no heightened scrutiny, and therefore no causal connection, and therefore no prima facie case of retaliation. Today, I ask this court to overturn the finding of the district court because it failed to view the evidence in the light most favorable to Ms. Kenney in reaching its conclusion. On temporal proximity, I know we have a wide range of cases, but there wasn't a lot of immediacy here. Wasn't it two to three months afterwards? Yes, Your Honor, and I'm not saying that this case is entirely based on temporal proximity. She only worked there for, this is her third stint of employment with this particular group of people. She was called back to work toward April of 2015, and she was terminated at the end of July of 2015. Throughout that time, she complains constantly. She testified that she complained constantly. She did remember two specific instances. One happened in the middle of May 2015, and that's where she complains that she believes that the hiring practices are racially discriminatory. She then testifies that although she can't remember the exact date, she complains in about June or July of 2015 that she believes that the owner is insisting that black employees be prosecuted for unemployment fraud and white employees are not to be prosecuted. These are internal complaints within the company? Yes, Your Honor. She's not complaining to federal authorities or state authorities. She's just complaining intra-company. Correct, Your Honor. She's complaining to April Jewell, who is human resources, and she's also complaining to Keith Quinn, who is the general manager and her supervisor. So the theory that they would retaliate her for making internal complaints are that what? That this would come out to the public or it would look bad on the company later on? What's the theory of why they would retaliate for internal complaints? I can't speak to why they would have retaliated against her for making internal complaints. Don't you have to prove that as causation? The rationale for retaliating against her? A reasonable inference that she complains internally and it's reasonable to assume that because of this they terminate her. I don't quite see the connection, that's all. Temporal proximity plus evidence of heightened scrutiny is enough to create that inference under Cantrell v. Nissan. You say heightened scrutiny, are you referring to action between the employer and the employee? When I say heightened scrutiny, I'm saying that they treated her differently after she started complaining than they did... So firing would count? Yes. So that means firing plus temporal proximity always gets you causation? No, I'm not necessarily saying firing. I'm saying the fact that they are attributing these three items to her, and these three items would be the number of quits, the one complaint from an employee's husband, and another complaint from another employee. They are attributing these complaints to her, whereas they would not have done so before. These parties have a very long history with each other, 20 plus years. And throughout the time that she is employed with them previously, they testify that at the very first place they worked at together 20 years ago, this place called Eagle, she works with Keith Quinn, and Keith Quinn testifies that she is very harsh with the hourly employees when she is managing them. When he is asked to clarify what very harsh means, what he means is that she is very direct, she wants to enforce all of the rules, and she wants the employees to produce faster. So essentially what he means by very harsh is that she is a strict manager. So then she comes back and she forms a company with them called Aspen in 2003. We really know the background, but here I think objectively you have two or more formal complaints filed against her for her conduct. The employer is not making those up. Those actually happened. There were complaints against her, right? So speaking to each of these complaints, and this is what I mean when I say that I feel that her rebuttal to these complaints should have been considered evidence of heightened scrutiny instead of evidence of legitimate business reasons. Not heightened scrutiny that there were complaints against her? I mean, it's a fact, right? No, Your Honor. I mean, yes, it is a fact that there are complaints against her, but her rebuttals to those complaints should have been considered when determining her prima facie case instead of just saying these complaints are legitimate business reasons. She did produce enough evidence to rebut each of these complaints, and I can address them in turn with regard to You're right about the prima facie case, but the more one talks about this topic, the more it looks like a case where there's no pretext, and they had legitimate objective grounds for doing what they did. Your Honor, in Cantrell v. Nissan, this court did establish that evidence of causation for the prima facie case can also be viewed as evidence of pretext, and it actually explained that while it looked as though previous rulings would indicate that you can't use evidence of causation for evidence of pretext, that was clarified in Wexler v. White's Fine Furniture, wherein as part of that case You can keep going down this road, I'm just not sure what it means. They're just two different inquiries. I get it that there's overlap, and you're asking one thing at the prima facie case, something else at pretext. But the reason they're different is prima facie is a lot easier. That's a much easier one, and that's where if we have any doubts, we say you've met it. But pretext, then we're getting to the ultimate question. Is there actually something for a jury potentially to find as to some retaliatory action? And there, all bets are off. The evidence is what it is, and you've got to rebut it. And they had an awful lot of evidence that she was a problematic employee and manager, most importantly. Your Honor, the evidence shows that she wasn't necessarily a problematic employee. She was a strict manager, and the employees complained that she was a strict manager. How many people left the company during this three-month period due to her? Whether they left due to her, Your Honor, is actually the third item that I think her rebuttal There were 50 people left during this period and about 30 attributed to her? And they were having trouble keeping employees? There is nothing in the record that indicates that these 30 people were attributed to her directly. The HR manager that testified about these people leaving testified, firstly, she changed her story three different times with regard to how many exit interviews she actually conducted. First, she said she spoke to between 30 and 40 employees who all said they were leaving because of Karen Kenney. Then she testified that no, it was closer to half of these employees. Then she said a few. And when I asked her why she produced two separate lists reflecting these quits to the EEOC, one with 57 people on it and another with 48 people on it, she said she did not know exactly why she was attributing these to Karen Kenney. And in fact, some of the people on this list, April Jewell testified that she didn't talk to them at all. She watched them walk out to their cars and leave. Help us out with just kind of pin down what your position is. Let's say it's roughly 50 people leave during this period. That's not good for a company that needs employees. So now we get to this question of connection to her. If you take the inferences your way, is the number two or three that are fairly attributable to her? Or is the number more like 20 to 30? What's fair? Because we have to figure that out in terms of what's triable issue of fact. What's a fair assessment giving you the benefit of the inferences? Your Honor, I can't give you a number or even a range. And the reason I can't do that is because – I thought you would say two to three. I thought you just went through the three options and you said the last time she said just two to three, that seems like the most favorable to you. Why wouldn't you just say two to three? I think she said a few. I don't think she said two. Okay, a few. Well, a few seems like under five. But even then, because of the inconsistency, I would maintain that the fact that April Jewell does not come across as credible with regard to how many people left because of Karen is a question that should go to the jury. And further, it's important to note that even while April Jewell is talking about some of the people who attributed – One possibility under the evidence is zero people left. That's really your ultimate position. Zero left due to her. I believe that that could be a position, that zero people left because of her. Even the employees who say that Karen Kenney is part of the reason they're leaving, April Jewell and Keith Quinn both concede that there are other reasons that they could have left. They both cite to the fact that they only pay the employees $9.50 an hour. Keith Quinn said that if they could find a job at five cents an hour more across the street, they would leave. Can I ask you about the allegations of racial discrimination? Yes. Does it matter whether those are credible or not with respect to a prima facie case? It matters whether they're reasonable. It doesn't matter whether they actually happened. It mattered that she had a reasonable belief that they happened. One of the complaints was about their hiring practices, that they weren't hiring people from Detroit, I think. Yes. And actually, Keith Quinn confirmed that there was kind of an unwritten policy that they tried to keep hiring practices within a 30-mile radius. So that's prima facie evidence of discrimination because they want to hire people who can get to work easily? Because Detroit is outside the 30-mile radius, right? Well, the evidence comes from when April Jewell actually tells her, the reason that we're not pulling from Detroit or Flint is because Ken Beatham doesn't like black people. And that's when Karen Kenney... How do you explain the fact that the percentage of the workforce that was African-American was dramatically greater than the African-American population within a 30-mile radius? Your Honor, the fact that they have an African-American population that works there does not affect whether they were trying to stop more African-American people from working there by limiting it in geographic scope? They also were advertising over the Internet, right? So the Internet has no geographic scope. And Your Honor, the record shows that Karen Kenney actually did not know how they were advertising. I see my time has expired. Can I briefly conclude on that point? Yeah. Thank you. When Karen was doing the recruiting at Aspen, before April Jewell was, she testified that they were recruiting in the green sheets, which is this employment circular. She wasn't using the Internet at that time. When she talked to April Jewell, she asked, where are we pulling from? And April Jewell says Oakland County, and she says Oakland County, and I think Livingston County. And Karen doesn't ask her by what method, and she testified a number of times that she doesn't know whether the... Was the allegation less credible if it's based on faulty information? No, it was based on the information that was given to her by... Faulty. So it was based on incorrect information. It was factually incorrect. She may have believed it was factually incorrect. So is an allegation that's made that's based on factually incorrect information less credible? I don't know that it was based on factually incorrect information. I don't know the truth of whether they were actually pulling from Oakland and Livingston, and I don't know if it was because Ken Beetham didn't like black people. I just know that that is what my client relied upon when she made that complaint. Thank you. Your full rebuttal, Mr. Coyle. No, it's not Mr. Coyle. Sorry. Go ahead. Good afternoon, Your Honors. My name is Scott Patterson. I represent the appellee, Aspen Technologies. Plaintiff presents a spirited argument. It just doesn't match up with the undisputed facts in this case. The fact of the matter is there were an increasing number of people quitting the company. It's undisputed that there were 57 people that quit between the plaintiff's hiring and her termination in July of 2015. That's undisputed. Is that a large number? Yes, actually, because it's also undisputed. As to an average, I mean, there's always turnover, but 57, is that way out of whack? Yes, the company had about 140 employees, so it was over 40 percent turnover during that period, and there's uncontroverted testimony from company officials that that was about double the normal rate of terminations. Okay, that's what I'm getting at. What's the normal turnover? And there was even testimony that it was the quit rate went down after the plaintiff left. I know that's not entirely relevant, but that is uncontroverted. There appears to be some controversy as to exactly how many of those people quit, specifically stated they were quitting because of the plaintiff. However, there's uncontroverted testimony from April Jewell that she talked to 30 or 40 of them, and they said they were quitting because of her or said things that indicated to April Jewell that she believed they were quitting because of her, and that's uncontroverted. I thought your friend on the other side said it was controverted. I'm not sure where the other side is getting that because her testimony was clear that it was 30 to 40 people that she talked to. Where there's some controversy is April Jewell had some difficulty at her deposition naming specific people off the list that she talked to, but her testimony was clear that she talked to 30 or 40 people and they told her or indicated to her that they were leaving because of the plaintiff. And I think the other point your friend would make is that they may have said that, but they also may have said four other things. There are certainly people who the testimony was that they said they would not put up with this, various words I can't say today, for the money they were making. It is entirely possible there's somebody who would have put up with Karen Kenney if they were making more money. This is a low-paid workforce. But there were people, the testimony is that there were people who told April Jewell that they were leaving because of Karen Kenney. The history of the three principles here was pretty lengthy. Yes. And is it fair to say that they knew that Kenney was kind of a hard charger and I don't know, disciplinarian is the right word. Yes, and that testimony, it was not shocking. I guess it was not shocking to the people involved at the company that this went south. However, she was a known quantity in terms of her personality. And the thinking on Ken Beetham's part, the owner of the company, that by bringing her in at this critical time that would help, it turned out it didn't. He was wrong. In hindsight, he shouldn't have hired her. He did hire her. She came back. It's a different time. It was hard to find workers during that period. The economy was humming. The workforce at that time did not respond to her methods. The alternate explanation is they knew all these things about her and still brought her in and then only terminated her after she complained about racial conditions. Yes, and that gets into the heightened scrutiny argument. With regard to heightened scrutiny, I mean, that is a valid concept. Basically the cases don't get this quite specific on it, but it's analogous to what's used in a discrimination case, comparable employees. Are they similarly situated? Only the plaintiff in a retaliation case under heightened scrutiny can use themselves as a comparable. They engage in conduct that's accepted by the company. They engage in the same conduct after they engage in the protected activity and they're terminated or disciplined. That can infer that the protected activity was a cause, that there's some connection between the protected activity and the discipline. That's the Cantrell versus Nissan case the plaintiff cites. That case, though, is easily distinguishable from this situation here. In that case, the plaintiff engaged in basically exactly the same behavior. There was little or no discipline imposed over time. She then engaged in protected activity, engaged in exactly the same behavior with the same effects she had before and was terminated. And that is different than what happened here. The plaintiff may have a particular personality and she may be somewhat abrupt and a stickler for rules, but there's no evidence whatsoever in the record that that ever resulted in the situations that resulted here. There was never a situation where written harassment complaints were made against her previously. There was never a situation during a previous employee where a large number of people quit and some or all of them attributed it to her. So what we have is a, I guess the testimony would be it's not shocking that something bad happened because she has this personality where she's going to be a stickler for the rules. However, the results of that behavior was significantly different than it ever had been before. I'd use the analogy of a truck driver who gets caught speeding several times but without any accidents. He's given written warnings or no discipline at all. Then he's speeding, his truck leaves the road, rolls over, and there's $75,000 worth of damage to the load and the cab. That's a different event even though you could, I guess, argue that he was speeding. It's the same as before, but the results were dramatically different, and that explains why the discipline was carried out here. It was the results of her behavior. It's such a refined argument when I think a prima facie case is usually pretty darn easy to meet. If I just think of my many years of these cases, there are just not that many where the employer wins on prima facie and particularly with statements like this in the record. That's just a real oddity to me. Well, you are correct. They usually shift pretty quickly to pretext, which gets to the question, is there something for a jury to try here? You are correct that the burden a plaintiff has to meet to satisfy the prima facie case is relatively low, although the plaintiff did not meet it in this case because a fundamental element of a prima facie case for retaliation is that she must show causation. There is absolutely no evidence in the record whatsoever to support causation. There is no mention whatsoever, no comments, no mention of these complaints ever again. She makes the complaints, allegedly. We'll accept that as true for purposes of this hearing. No concern shown by the defendants at any time. There's no discussion between them about this. There's no mention of it as part of the termination process. She's just fired. Well, she's just fired because 40% of the workforce quit in the space of three months. That's a pretext argument. That is our legitimate non-retaliatory reason for why she was terminated, and there's no dispute as to the facts over that in the record. The plaintiff has to dispute some facts. She can't just come in and say, I believe there's causation, and that satisfies her burden, as low as that burden may be. There is no evidence whatsoever in this case of causation other than the mere allegation that at some point she engaged in what she claims is protected activity, and for purposes of this hearing we have to assume that that's true. There is nothing else in the record regarding causation. There is no evidence whatsoever that there was any reason for her termination other than the undisputed facts regarding the results of her behavior, the harassment complaints and the increased quits. What's your best case for this where you've got such a charged racial statement, a claim of retaliation in response to it, and our court said at prima facie stage not enough evidence of causation, and there was a similar temporal proximity argument, and we said that's not enough by itself. What's the best case for us on that? I cited cases in our brief. I know. I just want the one you think is the best. You came in saying as long as they read this one, we'll affirm on the prima facie ground. Brown v. Lexington in Fayette County. That's the case that distinguishes the Carentel-Contrell case. The court held that there was no showing of a prima facie, that there was at best a tenuous connection between the termination and the allegations of causation, basically. What was the time frame in that one? The time frame? Your Honor, I don't know the time frame. It was fairly close proximity. Here we have two and a half months between the alleged protected activity and the termination, and there is specific case law holding that temporal proximity alone is not enough. That's where we get into the heightened scrutiny argument because she's trying to get around those cases about heightened scrutiny, about temporal proximity not being enough. Your Honor, there's ample evidence in the record to support the defendant's decision and to support the non-retaliatory reason for that decision. There's absolutely no evidence whatsoever regarding causation. In fact, there's no dispute as to the material facts. There's no dispute that there were increased quits during the time she was employed there. There's no dispute regarding the testimony that those increased quits were attributed, in many cases, to the plaintiff's behavior. There's no dispute that there were written harassment complaints made regarding the plaintiff. There's no dispute regarding the fact that other employees made verbal complaints  There are no comments, no reference whatsoever to these complaints by any of the managers at defendant. There's no connection whatsoever between these complaints and the actual act of the termination, and there's two and a half months between the one complaint that's alleged and the complaint that has a specific date on it and the actual termination which occurred at the end of July 2015. For those reasons, we feel you should affirm the trial court's decision-granting summary judgment and dismiss this appeal. Thank you. Thank you. Ms. Davidson. May it please the court, Your Honors. To clarify April Jewell's testimony with regard to these 30 to 40 people, her testimony is found at page ID 235 of the record, which is four pages of her deposition transcript. It's pages 69 to 72. And she initially guesses that 30 to 40 of these people quit because of Karen Kinney. But then she later says that she doesn't actually know how many she spoke to. She said that 30 to 40 people cited Karen as a reason for quitting, but then she says, yes, I mean, the ones that I got to spoke to, some of them were secondhand. That would probably be about 30 to 40 people. And then she's asked, you don't actually know, right? And she says yes. And she's handed both of these lists with everybody's name on them, and she cannot identify a single person on this list by name that spoke to her and complained about my client specifically. With regard to. Turnover rate was higher while Kenny was the manager as opposed to prior times. Your Honor, there was testimony that at some point an entire group of people who worked in Flint left because of transportation problems. So that's another item. That's another reason that they've cited to for people leaving, as well as, of course, the wage, which we've which I've already talked about. Discrimination point a little bit, doesn't it? I'm sorry? It cuts against your discrimination point a little bit, doesn't it? Not necessarily. If they're saying that an entire group of people quit because they had transportation issues, that gives another reason for people to leave other than Karen Kenny. With regard to causation, again, that can be. You agree it's but-for causation that we apply here? I do, that if she had not complained, the termination would not have happened. Simply put, the items that they're talking about, her being a difficult manager, these are all things they knew when they brought her back. I see my time has expired. May I briefly conclude? Initially, her being a difficult manager and demanding results was not a problem and, in fact, got her recruited from across the country. Then she complains about race discrimination, and all of a sudden these are a terminable offense. This case should not have been dismissed for failure to show a prima facie case. Thank you. Thanks to both of you for your helpful briefs and arguments. We appreciate it. The case will be submitted, and the clerk may call the next case.